STATE OF VERMONT
SUPERIOR COURT - ENVIRONMENTAL DIVISION

|  | { |  |
| --- | --- | --- |
| In re: Ferrera & Fenn | { | Docket No. 159-9-10 Vtec |
| Gravel Pit Application | { |  |

## Decision in On-the-Record Appeal

In this on-the-record proceeding, applicant Charles Ferrera and property owner Ronald Fenn (collectively, "Applicants") appeal a September 22, 2010 decision by the Town of Middlebury Development Review Board ("the DRB") denying an application for a 16-acre gravel extraction operation in the Town of Middlebury, Vermont. Applicants have filed a Statement of Questions raising 24 Questions for our review on appeal.

Applicants are represented by Charles J. Ferrera, Esq., proceeding pro hac vice, and Mark G. Hall, Esq. The Town is represented by Benjamin W. Putnam, Esq. Interested Persons Ronald Kohn, Barbara J. Shapiro, Joan Forbes, and Ben Burd represent themselves.

Applicants submitted an appellate brief. The Town has submitted a reply brief, to which Applicants responded. Interested Persons also filed a reply brief to which Applicants responded. We have reviewed all briefs submitted by the parties; those briefs have assisted the Court in its analysis of the legal issues presented in this on-the-record appeal.

## Background

### I. Application

Applicants submitted an application for a proposed gravel pit operation on property owned by Ronald S. Fenn in the Town of Middlebury, Vermont ("the Town"). The subject property is a ±71.5-acre parcel of land abutting VT Route 116. The application proposes a ±16-acre gravel pit with a 2,300-foot paved access drive. The proposed access drive would be located near the southern boundary of the property.

Pursuant to Section 610 of the Town of Middlebury Zoning and Subdivision Regulations ("the Regulations"), the gravel pit will be located entirely within the Forest Conservation District, while the access road will pass through the Medium Density Residential District and to the Forest Conservation District. The boundary line between these two zoning districts runs parallel to Route 116 and is located near the front (eastern) side of Applicants' property. The gravel pit will also be located in an Aquifer/Wellhead Protection Area overlay zoning district.

Applicants propose that hauling trucks associated with the project will access the gravel pit solely via the access drive, which will connect the project area to VT Route 116 approximately 120 feet north of the intersection of Quarry Road with VT Route 116. Excavation of the gravel pit will occur in four phases, of four acres each, with an estimated extraction rate of approximately 35,000 cubic yards per year. Applicants estimate that the project will last approximately 20-30 years,[1] with Applicants reclaiming the disturbed areas through top soil placement, seeding, and re-vegetation as they complete each phase and move onto the next.

The Lindale neighborhood, a modular home community, is adjacent to the northern boundary of the subject property. Across VT Route 116 to the west lies the Butternut Ridge residential neighborhood. South of the subject property is a 47-acre forested parcel, and south of that parcel is a Town-owned 70-acre forested parcel containing two auxiliary public water supply wells, Town Wells #3 and #4, which serve the Town water system. A woodlot owned by Champlain Construction Inc. lies to the east of the subject property, and east of that lot lies Green Mountain National Forest.

Several existing gravel pit operations are located in the immediate area to the north and south of the subject property. The Champlain Construction Co. and Case Street Redi-Mix facilities operate just north of the project site along Route 116; the existing J.P. Carrara & Sons gravel pit and concrete operations are located 1.5 to 2 miles to the south.

Applicants first submitted their application for the proposed project on August 28, 2008. They have continuously revised and updated the application during the course of these proceedings. The DRB held an initial public hearing on the application on September 22, 2008. At that hearing, the DRB granted Applicants' request for a recess, which lasted 12 months. Applicants submitted an amended application on August 17, 2009, and the DRB held ten additional public hearings between October 2009 and August 2010.

II.     **Decision Below**

In a decision dated September 22, 2010, the DRB denied Applicants' application for the gravel pit operation. In re Ferrera & Fenn Proposed Gravel Pit, Notice of Decision (Town of Middlebury Dev. Review Bd. Sept. 22, 2010) [hereinafter "DRB Decision"]. The DRB found that the proposed project failed to comply with eight provisions of the Regulations: (1) Section 750.I

---

[1] The DRB concluded that the project would last 20 years. In re Ferrera & Fenn Proposed Gravel Pit, Notice of Decision at 3, ¶12 (Town of Middlebury Dev. Review Bd. Sept. 22, 2010).

(noise performance standards); (2) Section 540.III.B.1 (undue adverse effect on the character of the neighborhood or area affected); (3) Section 540.III.B.2 (undue adverse effect on aesthetics);[2] (4) Section 540.III.F (conformance with the Middlebury 2007 Town Plan ("Town Plan")); (5) Section 630 (limiting the number of access drives onto principal town and state highways); (6) Section 786.II (test wells); (7) Section 680 (aquifer/wellhead protection areas); and (8) Section 786.VIII (vegetative buffers).[3] DRB Decision at 13. The Court discusses below the DRB's specific findings bearing on each of these conclusions.

## Standard of Review

In an on-the-record appeal, our role as a tribunal reviewing the decisions of municipal panels is similar to that of the Vermont Supreme Court when reviewing appeals from administrative bodies. That is, we do not take new evidence or complete our own determination of the facts. Instead, we will uphold the DRB's factual findings if they are supported by substantial evidence in the record. See In re Stowe Highlands Resort PUD to PRD Application, 2009 VT 76, ¶ 7, 186 Vt. 568 (mem.). In examining whether there is substantial evidence in the record, we are not permitted to make our own assessment of the credibility of witness testimony or reweigh conflicting evidence in the record. See Devers-Scott v. Office of Prof'l Regulation, 2007 VT 4, ¶ 6, 181 Vt. 248; In re Appeal of Leikert, No. 2004-213, slip op. at 2 (Vt. Nov. 2004) (unpublished mem.). We are simply to inquire whether the record includes relevant evidence that a "reasonable person could accept . . . as adequate" support for the rendered findings. Devers-Scott, 2007 VT 4, ¶ 6 (quoting Braun v. Bd. of Dental Exam'rs, 167 Vt. 110, 114 (1997)). We review the DRB's legal conclusions without deference unless such conclusions are within the DRB's area of expertise. Id.

## Discussion

Applicants contend that the DRB erred by denying their gravel pit application. In both their Statement of Questions and their appellate briefs, Applicants raise numerous procedural and substantive issues. For the reasons detailed below, we conclude that Applicants'

---

[2] In its decision, the DRB found that the project fails to comply with "Section 540 III(B)(1) (undue adverse effect on aesthetics)." DRB Decision at 13. It is actually Section 540.III.B.2 that addresses undue adverse effects on aesthetics, however. Thus, with regard to aesthetics, we will refer to Section 540.III.B.2 throughout this decision.

[3] As discussed below, the DRB also found that, as proposed, the project failed to comply with Section 540.III.C (traffic). However, because the DRB denied the application on other grounds, it declined to discuss the conditions that would be necessary to remedy this noncompliance.

3

procedural arguments are unavailing and that their substantive arguments are insufficient to warrant either overturning the DRB Decision or remanding the application to the DRB.

## III.     Procedural Issues

Applicants contend that the DRB Decision contains several procedural flaws. Specifically, Applicants argue that (1) the Town bears the burden of proof with regard to aesthetics; (2) the DRB failed to separately state findings of fact and conclusions of law; (3) the DRB failed to cite to the record; and (4) the DRB failed to separately affirm or deny Applicants' proposed findings of fact and conclusions of law. Applicants contend that each of these procedural flaws require that the Court remand its application back to the DRB with a directive to correct its procedural flaws. In its reply brief, the Town responds to these arguments and also contends that Applicants have waived their procedural claims by failing to properly raise their objections.

### 1.    Whether Applicants Properly Raised Their Procedural Arguments

We first address the Town's contention that Applicants failed to properly raise their procedural arguments. In their appellate briefs, Applicants allege numerous procedural defects in the DRB Decision. The Town contends that Applicants have not adequately briefed these procedural arguments, and therefore this Court may not address them on appeal. See V.R.A.P. 28(a)(4) (requiring that the argument section of an appellate brief "contain the issues presented, . . . the contentions of the appellant and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on"); V.R.E.C.P. 5(a)(2) (stating that the Vermont Rules of Appellate Procedure apply in Environmental Division proceedings); In re Boardman, 2009 VT 42, ¶ 20, 186 Vt. 176 (stating that where a claim "is inadequately briefed and argued, [it] need not be addressed on appeal").

It is true that Applicants provided only conclusory statements pertaining to their claims of procedural defects in their initial appellate briefs. They generally did not cite applicable authority, nor did they explicitly and comprehensively set forth their arguments as to each alleged defect. However, their reply brief contained more expansive arguments with citations to appropriate authority. Accordingly, we cannot say that Applicants' procedural arguments were inadequately briefed. We therefore decline to adopt the Town's assessment that Appellant's procedural arguments were so inadequately briefed that they should not be addressed by this Court. Our analysis of each of Appellants' procedural challenges follows.

4

## 2. Burden of Proof for Aesthetics

Subsection B of Section 540.IV of the Regulations provides that, under conditional use review, "[t]he <u>applicant</u> shall have the burden of proof that the project meets all standards [under the Regulations]." Regulations § 540.IV.B (emphasis added). However, subsection A of Section 540.IV specifies that, under conditional use review, the conditional use "[s]tandards and criteria that are the same or similar to those in Act 250 shall be applied with the same tests and procedures used in Act 250 case law." Regulations § 540.IV.A. Although an applicant has the burden of proof on most Act 250 issues, the burden of proof with regard to aesthetics is on the party opposing the project. See 10 V.S.A. § 6088; In re Denio, 158 Vt. 230, 236 (1992); In re McShinsky, 153 Vt. 586, 589 (1990).

Applicants cite Subsection A to argue that because both Act 250 review and conditional use review under the Regulations require a determination of whether a proposed project will create an undue adverse effect on aesthetics, the party opposing a project bears the burden of proof on that issue. Applicants complain that the DRB allowed and relied upon "inadmissible" evidence concerning aesthetics and appear to argue that, in the absence of this inadmissible evidence, there is no support for the DRB's findings and conclusions as to aesthetics. (Applicants' Brief at 5, 17, filed Feb. 15, 2012). In response, the Town contends that Subsection B places the burden of proof on Applicants.

Burdens of proof and their subsets—including the initial burden of production and the ultimate burden of persuasion—have been the grist of multi-volume treatises and idle conversations between lawyers and judges. No matter where the discussions occur, they often conclude with little added understanding of the legal concept. But we consider the needed analysis here as fairly straight-forward.

First, we begin with an oft-repeated procedural premise: that the initial burden of production always rests with the applicant in land use proceedings. In re Eastview at Middlebury, Inc., No. 256-11-06 Vtec, slip op. at 5 (Vt. Envtl. Ct. Feb. 15, 2008) (Durkin, J.), aff'd 2009 VT 98. This procedural requirement has a common-sense foundation, since before a reviewing tribunal can hear and understand the criticisms of a project, the applicant needs to provide an initial explanation of the project and some evidence of whether it conforms to the applicable land use regulations.

This allocation of the initial burden of production remains true, even where the ultimate burden of persuasion is placed upon the party opposing an application under certain Act 250 criteria, pursuant to 10 V.S.A. § 6088. Id. (citing Re: John J. Flynn Estate and Keystone Dev. Corp., Docket No. 4C0790-2-EB, Findings of Fact, Conclusions of Law and Order, at 17 n.4 (Vt. Envtl. Bd. May 4, 2004)).[4] Thus, even where the applicable procedural rules place the ultimate burden of persuasion upon a party opposing a land use application, the applicant must present some initial evidence that the proposed project conforms to the applicable regulations.

The Town Regulations at issue here governing conditional use review require the same procedural burdens of production and persuasion established for Act 250 proceedings. See § 540.IV.A.[5] We therefore conclude that on the question of whether the proposed project causes an undue adverse aesthetical impact, Applicant was obligated to fulfill the initial burden of production, and the project's opponents were obligated to fulfill the ultimate burden of persuasion.

We address in more detail below the DRB's legal analysis of the aesthetic criterion. But we decline to adopt Applicants' procedural challenge that the parties opposing Applicants' project failed to present evidence that addresses their evidentiary burden concerning aesthetics. We also decline to adopt Applicants' assertion that some or all of the evidence offered in opposition to their project was inadmissible and should have been excluded, since the record does not reveal that Applicants offered objections when that evidence was initially presented to the DRB, nor does the record reveal that Applicants properly preserved their evidentiary objections for review in this appeal. As we note in more detail in our substantive analysis below, the record contains a wealth of testimony and other evidence that speaks to the aesthetic impacts of the proposed project. Applicants' assertion of this procedural violation, to the extent that we have correctly understood it, is not supported by the record. We therefore decline to reverse or remand on this procedural basis.

---

[4] Pursuant to 10 V.S.A. § 8504(m), decisions of the former Environmental Board are to be given the same precedential weight and consideration as those of the Environmental Division.

[5] Regulations § 540.III.B.2 requires that the DRB must determine whether a proposed project will have an undue adverse effect on aesthetics, which is identical to the determination a district commission is charged with making under Act 250 criterion 8, codified in 10 V.S.A. § 6086(a)(8).

### 3. Separately Stated Findings of Fact and Conclusions of Law

The Municipal Administrative Procedure Act ("MAPA"), 24 V.S.A. §§ 1201–1210, requires municipal panels to issue final decisions in writing in which they "separately state findings of fact and conclusions of law." 24 V.S.A. § 1209(a). Applicants argue that because the DRB did not include a separate section labeled "Conclusions of Law," or otherwise distinguish its findings of fact from its conclusions of law, we must remand this matter to the DRB for it to separately state such findings and conclusions. In response, the Town argues that although the findings of fact and conclusions of law appear under one general heading, the findings and conclusions are in separately numbered paragraphs, categorized in subsections that separately list the legal subjects of the DRB review. The Town also asserts that the content of each numbered paragraph makes clear whether the DRB intended the statement as a finding of fact or a conclusion of law. We agree with both of the Town's assertions.

Applicants have not cited any case or statutory law requiring an appropriate municipal panel to use distinct headings for its findings of fact and conclusions of law. Nor has our research revealed any. Moreover, the DRB's decision is well-organized by topic. Although it would have been helpful and advisable for the DRB to label individual paragraphs as findings of fact or conclusions of law, we cannot say that the DRB's failure to do so is fatal to its decision. The DRB's use of terms such as "conclude," "find," and "based on" sufficiently distinguish the findings of fact from the conclusions of law. Consequently, we conclude that the decision satisfies 24 V.S.A. § 1209(a).

### 4. Citations to the Record

Applicants argue that this matter must be remanded to the DRB because the DRB did not include specific citations to the record within its findings. However, Applicants do not point us to any case or statutory law requiring the DRB to do so. Although 24 V.S.A. 1209(b) requires that the DRB "explicitly and concisely restate the underlying facts that support the decision," it does not require specific and individualized citations to the record where those facts were presented. Accordingly, although citations to the record are always helpful and advisable, the failure of the DRB to do so does not warrant remand.[6]

---

[6] Applicants briefly argue that the DRB failed to explicitly and concisely restate the underlying facts supporting its decision, as required by 24 V.S.A. § 1209(b). Because our review of the substantive issues requires us to determine whether there is substantial evidence in the record to support the DRB's decision, our discussion in Part II below incorporates the issue of whether the DRB explicitly and

7

**5. Separately Affirm or Deny Applicants' Proposed Findings and Conclusions**

Finally, Applicants argue that the DRB was required to separately affirm or deny their proposed findings of fact and conclusions of law. If a party submits proposed findings of fact, the Vermont Administrative Procedure Act ("the Vermont APA") requires that an agency decision "include a ruling upon each proposed finding." 3 V.S.A. § 812(a). However, the Vermont APA does not govern municipal zoning boards. In re Maple Tree Place, 156 Vt. 494, 497 (1991) ("The APA does not apply to local boards or commissions"), and MAPA does not contain a similar requirement. Accordingly, the DRB did not err by failing to separately affirm or deny Applicants' proposed findings of fact and conclusions of law.

**IV. Frequency of Truck Travel Due to the Proposed Project**

Before turning to the merits of the DRB's conclusions, we must address the DRB's treatment of a particular factual issue in this case: how often gravel trucks will pass to and from the site and what traffic and noise impacts such truck passage could have on the area and neighborhood. The potential disturbance associated with this gravel pit includes machinery and activities on the site itself, but also the movement of trucks entering and exiting the site. We note that the various ways one can represent the frequency of truck travel can have different implications for evaluating the magnitude of a potential disturbance: average trips per hour during operating hours, average trips per hour during daily (or weekly or monthly) peak hours of operation, maximum trips per hour over the course of some delineated period of time (maximum per day, per month, per year), and the maximum capacity or potential for trucks traveling the given stretch of road within one hour at any point during the duration of the project. These variations on how estimated truck trips may be presented are further complicated by the reality that these estimates should not be taken as exact predictions of how trucks will travel to and from a project site in full operation. The distinctions between how estimated traffic impacts are described can assume particular importance for towns that have chosen qualitative rather than quantitative noise performance standards, as the Town of Middlebury has done.[7]

---

concisely restated underlying facts supporting its decision and whether the record contains substantial evidence of such facts.

[7] As discussed further below, Section 750.I of the Regulations limits noise volume "to levels that will not be a nuisance to adjacent uses. . . . Noise levels or frequencies which are not customary or reasonably

The Middlebury DRB explicitly mentioned the truck passage rate in analyzing—and ultimately finding that Applicant's plan would violate—four[8] sections of the Middlebury Zoning and Subdivision Regulations.[9]   The DRB also relied on the truck passage rate in determining that the project would generate only a minimal increase in overall traffic and would therefore not violate the conditional use criterion in Section 540.III, at least on the basis of overall traffic volume.[10]   In doing so, it characterized the truck passage rate in differing ways. Naturally, understanding which figure the DRB relied upon is important because in on-the-record appeals of decisions by appropriate municipal panels,[11] often referred to as "AMPs," this Court must examine the AMP's findings of fact to determine whether substantial evidence in the record supports them.  See Stowe Highlands Resort, 2009 VT 76, ¶ 7.

While the DRB's varying characterizations of traffic estimates may be confusing to the first-time observer, it is common for applicants, their experts, and opposing parties to refer to one-way traffic trips, round trips, maximum or peak rates of generated traffic, average rates of generated traffic, and even the average rates of truck traffic during hours of maximum output from a proposed project.   There is even a term often used by traffic experts to help design highways:  the "design hour" of estimated traffic, referring to something less than a peak hour of traffic.   We are thankful that neither the DRB nor the Applicants referenced an estimated design hour of traffic.  But we note that while the multitude of accepted classifications used in estimating the traffic to be generated by a proposed project can cause confusion, that confusion can be minimized when both the writer and the reader pay careful attention to the manner in which the terms are used.

expected in consideration of the character of the district or neighborhood and which represent a substantial repeated disturbance to others shall be presumed to constitute a nuisance."

[8]  Noise performance standards (Section 750.I), as well as three conditional use criteria: character of the neighborhood or area affected (Section 540.III.B.1), aesthetics (Section 540.III.B.2), and conformance with the Middlebury 2007 Town Plan (Section 540.III.F).

[9]  The DRB also found violations of four other provisions and mentioned traffic safety concerns unrelated to overall traffic volume in its Section 540.III analysis.  We discuss these topics separately below.

[10]  The DRB cited other aspects of this conditional use criterion in finding "significant safety concerns that would need to be addressed were this project to proceed," but Section 540.III did not form a basis for the DRB's denial of the application.

[11]  The phrase "appropriate municipal panel" is used throughout the Vermont Municipal & Regional Planning Chapter (24 V.S.A. chapter 117), including in subsections 4468 and 4472, which govern appeals to and from an AMP, respectively.

Even Applicants here, and their experts, found it somewhat difficult to maintain a consistent approach in their traffic analysis. For example, Applicants and their experts sometimes presented evidence of total truck trips, but Applicants also repeatedly reference only "loaded" truck trips, including in their criticism of the DRB Decision. Throughout our analysis, we refer to the total number of truck trips, not only the number of loaded truck trips, since any truck that leaves the proposed project with a load of sand or gravel will, by necessity, have to first travel to the project to receive the load, thereby necessitating two one-way truck trips across the area's highways. Although Applicants argue that the DRB should have considered only the loaded trucks because they are generally louder than empty trucks, they fail to point to evidence in the record suggesting that noise from an unloaded truck is too minimal to be considered.

As a preliminary matter, before addressing Applicants' substantive challenges to the DRB decision, we provide the following analysis, including case law precedent, concerning how to assess the impacts from any traffic a proposed development may generate.

### 1. Average truck frequency.

The first page of the Application states, "It is anticipated that this project will generate an average of 40 <u>loaded</u> truck trips per day." (Ex. 11; Appellant's Printed Case [APC] at 2) (emphasis added). Forty loaded trips result in 80 <u>total</u> one-way truck trips per day (that is, 10 trips per hour or one every 6 minutes on average). Elsewhere in the Application, however, Applicants estimate less frequent "average hourly truck trips" (48 total trips per day, which equates to 8 every hour in an eight-hour business day, which equates to an average of one truck trip every 10 minutes) (Ex. 11; ACP at 31, Table 5). In contrast, Applicants' witness, Mr. John Pitrowiski, P.E., offered further testimony that there could be an average of 40 truck trips per day, or one every 12 minutes. Pitrowiski Test. at DRB Hr'g on Oct. 12, 2009, Tr. at 34:14–17 ("[T]wenty truckloads per day . . . but – each truckload represents two trips, one in, one out."); Id. at 35:16–17 ("[T]he average daily traffic for this project is 20 [trucks]out, 20 [trucks] in."). Thus, the record as a whole contains evidence suggesting average rates of one truck trip every 6, 10, or 12 minutes throughout an 8-hour working day.

### 2. A range for truck frequency.

Pitrowiski also testified to truck frequency in terms of a range, stating:

We had figured an average of 40 trips per day, maybe on a peak day or on a normal day when you're supplying a project, divided by eight hours, that's five – that's actually five trips per hour. If we go 80 trips per hour [sic] that's 80 divided by 8 hours, is 10 per hour. So . . . it's between five and ten [trips per hour] if you assume that this project is a generator.

Pitrowiski Test. at DRB Hr'g on Jan. 23, 2009, Tr. at 81:2–9. Thus, Pitrowiski appears to have presented a range of one truck every 6–12 minutes.

### 3. Maximum, peak, or peak hour truck frequency.

In the Application, Applicants estimate the "maximum hourly truck trips" as 12 (i.e., one every 5 minutes) (Ex. 11; ACP at 31, Table 5). The table does not indicate how frequently this maximum would occur. At the hearing, Pitrowiski testified, "During the peak hour of traffic, there'd be six trucks entering and six trucks leaving. That equates to about one truck every five minutes of production." Pitrowiski Test. at DRB Hr'g on Oct. 12, 2009, Tr. at 34:19–22 (emphasis added). He did not estimate how often "the peak hour of traffic" would occur. Id. At the continuation of the hearing on January 11, 2010, however, Pitrowiski referred to a "one truck every 6 minutes" figure, rather than a "one truck every 5 minutes" figure. He characterized the "one truck every 6 minutes" figure as a "maximum,"[12] "the peak situation,"[13] and "the worst-case scenario."[14] Regarding how often this maximum might occur, Pitrowiski stated without further explanation, "I wouldn't anticipate that happening very frequently." Pitrowiski Test. at DRB Hr'g on Jan. 11, 2010, Tr. at 79:5–7. Thus, the record as a whole contains evidence suggesting "peak hour of traffic" or "maximum" rates of one truck every 5 or 6 minutes.

Applicants and the Town also offer differing interpretations of the portions of the DRB decision that refer to the differing traffic estimates. In their initial brief, Applicants contend that the DRB interpreted Pitrowiski's testimony as establishing an average (rather than a "maximum") rate of one truck every 6 minutes. In contrast, the Town urges us to interpret the DRB's language as referring to "the rate of truck traffic during peak levels of operation, rather than the average rate," stating that activities "can adversely affect nearby residents even if they

---

[12] "Well, if you assume the maximum, maximum-maximum, 80 trips per day . . . That equates to ten per hour. So maximum situation would be 10 for every 60 minutes or one trip every six minutes." Pitrowiski Test. at DRB Hr'g on Jan. 11, 2010, Tr. at 78:18–24 (emphasis added); "A maximum of ten trips per hour." Id. at 95:21–22 (emphasis added).

[13] "So one truck every six minutes would be kind of the peak situation." Id. at 79:5–7 (emphasis added).

[14] Responding to a neighbor's comment that one truck every six minutes "would classify as a substantial repeated disturbance for me," Pitrowiski stated: "That is – that was the maximum, again, worst-case scenario. If there was a project where the demand was that great." Id. at 84:12–16 (emphasis added).

occur only during peak periods, rather than constantly throughout the day or night." (Town's Br. 13, filed Mar. 21, 2012). In reply, Applicants argue that the term "maximum" is distinct from "peak hours during any day," asserting that "there was no evidence on the record that the project would *ever* operate at its maximum." (Applicants' Reply Br. 7, filed Mar. 22, 2012).[15] Although Applicants now maintain that "maximum" and "peak" are materially different terms, they point to no evidence suggesting that they presented this interpretive distinction to the public and to the DRB, aside from Mr. Pitrowiski's vague statements at the January 11, 2010 hearing.

The parties have not pointed to evidence establishing a clear estimate of how frequently such a peak hour or maximum would occur. But the evidence presented supports the DRB's finding that the project, operating at its peak, could generate ten truck trips per hour, which equates to one trip every six minutes. DRB Decision at 8, ¶ 40. The DRB relied upon these representations in rendering its factual findings concerning traffic, and we conclude that the record reveals substantial evidence, including that offered by Applicants' own witnesses, for the DRB's findings.

Applicants now appear to challenge the legitimacy of the evidence that the DRB relied upon in rendering its findings, and they complain in their initial brief that the DRB "used the wrong facts." Applicants' Brief at 25 (filed Feb. 15, 2012). Our review here does not permit an independent analysis of what facts were "right" or "wrong" to rely upon. We are merely charged with determining whether the DRB's factual determinations have adequate support in the record. Devers-Scott, 2007 VT 4, ¶ 6. We do not consider whether we agree with the DRB's factual determinations; it would be improper to do so, since only the DRB members were present to assess the weight of evidence and credibility of witnesses at the eleven hearings that were held.

The DRB rationalized that when considering a project's impact, it is appropriate to rely upon peak traffic disturbances. DRB Decision at 10–11, ¶59. We know of no barrier to a land use panel relying upon the maximum or most onerous impacts a project may have when attempting to determine if that project will bring undue adverse impacts to a neighborhood.

---

[15] We note that at least as a statistical matter, it is impossible to have a series of numbers whose "maximum" never occurs, as the maximum is—by definition—the highest number in a series; it occurs at least once. See Merriam-Webster Online Dictionary, available at www.merriam-webster.com/dictionary/maximum (defining "maximum" as "the largest of a set of numbers").

12

Applicants have not presented us with the legal precedent for such a prohibition, even while arguing that the DRB findings and assessments were egregious. We decline to adopt Applicants' assessment in our on-the-record review.

At various points in its analysis, the DRB also emphasized that for the Lindale and Butternut Ridge neighborhoods, which already experience impacts from two nearly gravel pits, adding a third pit in closer proximity has a cumulative impact that would be "undu[ly] adverse." See, e.g. DRB Decision at 7-8, ¶ 31. Our Supreme Court has directed that cumulative impacts must be considered in order to "conduct[] a complete analysis in applying the conditional use standards . . . ." In re John A. Russell Corp., 2003 VT 93 ¶33, 176 Vt. 520. The Russell precedent provides much guidance to our review of the appropriateness of the DRB decision here. In Russell, an applicant sought state and local permits to construct and operate an asphalt manufacturing plant on property where it was already operating a sand and gravel pit and a rock quarry operation. Id. at ¶¶ 1–4. In appeals from the municipal permit proceedings, this Court concluded, in part, that the proposed asphalt plant "would not adversely affect the character of the area based on evidence that, as proposed, the plant would operate 'within the hours, truck limits, and noise limits of the existing quarry, gravel pit[,] and rock crushing operation' . . . ." Id. at 32. The Vermont Supreme Court concluded that this Court's analysis was incomplete, since the "failure to look at [the] differential impact of industrial uses in a zone intended primarily for residential and commercial uses creates the risk that the character of the neighborhood will incrementally shift so that the industrial uses dominate." Id. at 527–528 (citations omitted).

Applicants appear to assert that the DRB's factual finding are so egregious, conflicting, and clearly erroneous that this Court must vacate the DRB findings and direct the DRB on remand to perform a new review. We decline to do so, since the DRB findings, particularly on the matters of truck traffic and operational noise, while not a model of clarity, provide an understandable foundation of its factual analysis, particularly in light of the somewhat conflicting testimony offered by Applicants. Despite the sometimes confusing drafting of the portions of the DRB decision mentioning truck passage rates, we are satisfied that the DRB focused on peak rates of one truck every 6 minutes when it considered the impacts of passing trucks on the neighboring communities. We see no precedent forbidding them from using peak rates in such an analysis, and we find substantial evidence in the record supporting the factual

13

finding of one truck every 6 minutes at peak times. We therefore move past the last of Applicants' procedural challenges without disturbing the DRB's determinations and now move to our analysis of Applicants' substantive challenges to the DRB Decision.

## V.    Substantive Issues

Applicants contend that the DRB erred by denying their application based on (1) noise performance standards (Regulations § 750.I); (2) an undue adverse effect on the character of the neighborhood or area affected (Regulations § 540.III.B.1); (3) an undue adverse effect on aesthetics (Regulations § 540.III.B.2); (4) traffic (Regulations § 540.III.C); (5) conformance with the Middlebury, Vermont 2007 Town Plan ("the Town Plan") (Regulations § 540.III.F); (6) access limitations on principal towns and state highways (Regulations § 630); (7) test wells (Regulations § 786.II); (8) aquifer/wellhead protection areas (Regulations § 680); and (9) vegetative buffers (Regulations § 786.VIII). We address each one in turn.

### 1.    Noise Performance Standards (Regulations § 750.I).

Applicants contend that the DRB erred when it concluded that the proposed project would not comply with Regulations § 750.I, which establishes a performance standard for the noise to be emitted because of a proposed project. Applicants first argue that their expert witnesses correctly analyzed the potential noise impacts of the project using a standard that the Environmental Board has applied in similar analyses under Act 250: a 55-decibel maximum at a residence or area of frequent human use.[16] In response, the Town argues that the Regulations establish a qualitative, not quantitative standard for evaluating noises to be allowed from a proposed project, and therefore the 55-decibel maximum standard is just part of the DRB's consideration of whether the project's noise will constitute a "nuisance to adjacent uses." Regulations § 750.I. We agree with the Town.

As discussed above, Regulations § 540.IV.A provides that "[s]tandards and criteria that are the same or similar to those in Act 250 shall be applied with the same tests and procedures used in Act 250 case law." This provision is located at the end of Section 540, the conditional use review section of the Regulations, and thus it applies only to those standards and criteria that govern conditional use review. The Town has chosen to address noise performance standards separately in Regulations § 750.1, which is separate and in addition to the Town's

---

[16]   Under 10 V.S.A. § 8504(m), this Court must give "the same weight and consideration" to prior decisions of the former Environmental Board as it gives its own prior decisions.

conditional use review process. Accordingly, Regulations § 540.IV.A does not govern review of the noise performance standards under Regulations § 750.I, and the 55-decibel maximum standard used by the Environmental Board in the Act 250 context[17] does not govern the DRB's consideration of whether Applicants' proposed project conforms to the Town's noise performance standard.

Section 750.I contains no quantitative restriction of decibel levels, but rather directs a more qualitative analysis of whether a proposed project would produce noise that would constitute "a nuisance to adjacent uses." Id. We therefore embark upon a review of the legal standard established by § 750.I and the DRB's analysis of that standard.

Regulations § 750.I provides that:

Noise volume shall be limited to levels that will not be a nuisance to adjacent uses. . . . Noise levels or frequencies which are not customary or reasonably expected in consideration of the character of the district or neighborhood and which represent a substantial repeated disturbance to others shall be presumed to constitute a nuisance . . . .

Regulations § 750.I (emphasis added). The Regulations thus set forth a two-part test to determine when noise will be presumed to be a nuisance and therefore impermissible. A proposed project will qualify for the presumption as a prohibited nuisance if the associated noise levels (1) are not customary or reasonably expected based on the character of the district or neighborhood; and (2) represent a substantial repeated disturbance to others. Id. Even where no presumption applies, § 750.I still obligates the DRB to determine whether the noise from a project constitutes a nuisance, which the DRB is authorized to so find when the credible evidence presented supports such a conclusion. Although decibel levels may well enter into the DRB's analysis, the Regulations contain no quantitative decibel maximum and no restriction that the DRB only look to decibel levels.

Taking into account its factual findings concerning the proximity of the gravel pit operations to the adjacent residential neighborhoods, which are located in a zoning district devoted primarily to residential, commercial, and school uses, as well as the truck traffic and resultant noise that the project will bring to these residential neighborhoods, the DRB concluded that Applicants had "failed to satisfy the [noise performance] standard in the Town

---

[17] Even if this standard were relevant, it is only one part of the aesthetics analysis in the Act 250 context; it would be incorrect to say that any project that meets the standard would be automatically approved on the basis of specific noise levels alone.

Regulations as written" and that "the noise from the proposed gravel extraction operation will add to the intensity of what currently exists in this area and is not acceptable; the project will be a nuisance to adjacent uses and represent a substantial repeated disturbance." DRB Decision at ¶¶ 59–60. The DRB's findings are substantially supported by the evidence included in the record, and those findings provide an adequate legal foundation for the DRB's legal conclusions. We therefore do not disturb the DRB's findings and we concur with its legal conclusions as to compliance with the noise performance standards contained in Regulations § 750.I

We note that all performance standards contained in Regulations § 750 are mandatory, including the noise performance standards in Sub-Section I. Thus, with just one legal determination of non-conformance, the proposed project cannot secure approval. Id. Nonetheless, we continue our review of the remaining challenges Applicants present, so that our review may be deemed thorough and complete.

## 2. Character of the Neighborhood or Area Affected (Regulations § 540.III.B.1).

Applicants contend that the DRB erred by concluding that the proposed project does not comply with Regulations § 540.III.B.1, which provides that a "project shall not have an undue adverse effect on the character of the neighborhood, or area affected." The Regulations then define "neighborhood" to mean "in the same area; nearby including but not limited to the area within sight and/or sound." Id. The Regulations instruct the DRB to consider the following when considering the character of the neighborhood or area affected:

a. Existing neighborhood uses, types of buildings, noise and traffic;
b. Town Plan objectives including but not limited to planned future neighborhoods, and neighborhood character enhancement;
c. Historic buildings and features; intensity, uniformity, or mix of uses and buildings; mass, scale and spacing of buildings; scenic views, aesthetics, open space; and
d. Privacy, security, identity, sense of community and cohesion.

Id. The Regulations specify that "[t]he existence of one conditional use in a neighborhood shall not be interpreted as justification for another similar conditional use to be located there." Id.

We first address Applicants' argument that Regulations § 540.III.B.1 is unconstitutionally vague and therefore invalid. Specifically, Applicants contend that there are no standards in the Regulations defining the area affected. We disagree.

16

Because zoning ordinances are subject to constitutional limitations, "laws that are vague or those that delegate standardless discretion" cannot be enforced. In re Appeal of JAM Golf, LLC, 2008 VT 110, ¶ 17, 185 Vt. 201. Thus, zoning ordinances must be "general enough to avoid inflexible results, yet . . . they should not leave the door open to unbridled discrimination." Town of Westford v. Kilburn, 131 Vt. 120, 125 (1973). However, the Supreme Court has balanced its directive of protecting against "unbridled discrimination," by noting that standards in municipal regulations should be upheld, even if they are general, provided that a "look to the entire ordinance, not just the challenged subsection, . . . determine[s] the standard to be applied." In re Pierce Subdivision Application, 2008 VT 100, ¶ 20, 184 Vt. 365 (quoting Kilburn, 131 Vt. at 125) (other citations omitted).

With these Supreme Court directives in mind, we cannot say that Regulations § 540.III.B.1 gives standardless discretion. That section provides that a "project shall not have an undue adverse effect on the character of the neighborhood, or area affected" and defines "neighborhood" as "in the same area; nearby including but not limited to the area within sight and/or sound." Regulations § 540.III.B.1. The ordinary meaning of "affect" indicates that the scope of an inquiry under Section 540.III.B.1 will be limited to those areas that will be influenced in some way by the project. See Black's Law Dictionary, affect (9th ed. 2009) (WL) (defining "affect" as "[m]ost generally, to produce an effect on; to influence in some way"); Merriam-Webster Online Dictionary, available at www.merriam-webster.com/dictionary/ affect (defining "affect" as "to produce an effect upon . . . to produce a material influence upon or alteration in"). This definition is general enough to prevent inflexible results, but it did not leave the DRB free to exercise standardless discretion, as the DRB was limited to a review of areas that the project will influence. This included areas within sight or sound, as contained in the definition of "neighborhood." These provisions provide clear direction of the area the DRB was required to consider. Consequently, we conclude that Regulations § 540.III.B.1 is not unconstitutionally vague in the manner that Applicants suggest.

Here, the Lindale and Butternut Ridge neighborhoods are "in the same area; nearby including but not limited to the area within sight and/or sound" of the proposed pit and therefore are within the neighborhood area that § 540.III.B.1 required the DRB to consider when considering the potential impacts from Applicants project. It was thus not inappropriate for the DRB to consider the ways the proposed gravel pit could affect these residential communities.

The DRB found that the Lindale neighborhood would feel the greatest impacts from the project. DRB Decision at 5, ¶ 24. The DRB characterized that neighborhood as having a "relatively quiet character," id. at 6, ¶ 29, despite the fact that some noise from nearby gravel operations is currently audible in both Lindale and Butternut Ridge. The DRB focused primarily on the "much more significant and invasive level of noise" that this project would cause because of its closer proximity to the neighborhoods than the other gravel pits and because of the placement of the proposed access road near Lindale. Id. at 5, ¶ 24. The DRB stated, "The Lindale/Butternut Ridge neighborhood would, with the added proposed gravel pit and truck traffic now experience substantial added noise from a closer source, between [the other two gravel pits], and now directly adjacent to Lindale." Id. at 6, ¶ 27.

There is evidence on the record that the proposed pit is physically closer to the Lindale and Butternut Ridge residential areas than are the existing gravel pits, which already bring truck traffic and operational noise to a district devoted primarily to residential, commercial, and governmental uses.[18] There is evidence on the record that the project will increase truck traffic and noise levels in those areas. Applicants presented figures for truck passage on the road that ranged from an average during working hours of one truck every 6, 10, or 12 minutes and peak or maximum passage rates of one truck every 5 to 6 minutes. We have already addressed Applicants' procedural challenges to the manner in which the DRB stated its findings that relate to the frequency of truck traffic. Specifically, we note that it was not inappropriate for the DRB to reference the "peak" or "maximum" levels of truck traffic, nor was it inappropriate for the DRB to address the incremental impact upon the adjacent residential neighborhoods of an additional gravel pit operation in close proximity, in accordance with the wisdom of the Russell Court. Thus, when viewed in total, there is substantial evidence in the record supporting the DRB's finding that the proposed pit would have undue adverse impacts on the character of the affected residential areas.

### 3. Undue Adverse Effect on Aesthetics (Regulations § 540.III.B.2).

Applicants contend that the DRB erred by finding that their proposed project would have an undue adverse effect on aesthetics in violation of Regulations § 540.III.B.2. This section refers the DRB to Section 530 of the Regulations, which specifies that the DRB, when

---

[18] Regulations § 610.II (defining the permitted and conditional uses for the Medium Density Residential Zoning District). As noted above and by the DRB, the parcel Applicants seek to develop is partially located in the Medium Density Residential District. DRB Decision at 3, ¶ 9.

considering aesthetics, shall perform a <u>Quechee</u> analysis, which is a two-step test used in the Act 250 context to gauge undue adverse effects on aesthetics under Act 250 criterion 8. Regulations § 530.III.B.2 prohibits unduly adverse effects upon aesthetics; this is similar to the analysis under Act 250 criterion 8. Thus the analysis traditionally applied to criterion 8 (the <u>Quechee</u> test) applies here. As explained above, although an Act 250 permit applicant has the burden of proof on most Act 250 issues, the burden of proof with regard to aesthetics is on the opponents to the project. See 10 V.S.A. § 6088; <u>In re Denio</u>, 158 Vt. 230, 236 (1992); <u>In re McShinsky</u>, 153 Vt. 586, 589 (1990).

The first step of the <u>Quechee</u> analysis to determine whether a project has an adverse effect: that is, whether it will not be in harmony with its surroundings. <u>Re Quechee Lakes Corp.</u>, No. 3W0364-1A-EB, Mem. Of Decision, at 8-10 (Vt. Envtl. Bd. Feb. 3, 1987). The second step is to determine whether the identified adverse effect is "undue." <u>Id</u>. The Regulations rearticulate the "undue" prong of <u>Quechee</u> by defining an impact as "undue" (1) if the project violates a specific Town standard or regulation; (2) would be "unharmonious or detrimental to the attractiveness and character of Middlebury and the DRB finds it would be shocking or offensive to the average resident," <u>or</u> (3) if the applicant unreasonably rejects measures that could have mitigated the project's negative aesthetic effects. Regulations § 530.III.B.2.

We have already stated that the record contains substantial evidence that supports the DRB's determination that the project would not be in harmony with the adjacent residential neighborhoods, despite the presence of other gravel pits farther away. We thus turn to the second prong of the <u>Quechee</u> test. An impact may be "undue" where a project violates Town standards or regulations. The DRB's finding that the project would violate the Town noise performance standards found in Regulations § 750.1 provides strong support for the contention that the project's impact is "undue" under the Town's articulation of the second prong of <u>Quechee</u>. Specifically, the DRB found that "the addition of truck traffic at a rate of one truck every 6 minutes on VT Route 116, with the associated noise, exhaust, and visual impacts, will cause an undue adverse impact [to the adjacent residential neighborhoods] as it relates to aesthetics." DRB Decision 7, ¶ 35.

Applicants' complaints about this section of the DRB findings and conclusions appear to be premised solely upon the DRB's reliance upon peak or maximum truck traffic estimates. As we have already noted, the record contains substantial evidence for these peak traffic estimates.

We find no error in the DRB's reliance on peak traffic figures when assessing whether a project will bring an undue adverse impact to a neighborhood. The DRB also based its legal conclusions upon the cumulative impact of the noise and traffic this adjacent project will bring to these residential neighborhoods, particularly when coupled with the traffic and noise from sand and gravel operations nearby but not adjoining these neighborhoods. We find no error in the DRB's analysis and final determination that Applicants' proposed project did not conform to the aesthetic standards established in Regulations § 540.III.B.2.

### 4. Traffic (Regulations § 540.III.C)

Applicants argue that the DRB erred by ignoring expert testimony and concluding that significant traffic safety concerns would remain if the project were to proceed.[19] Regulations § 540.III.C provides, in pertinent part, that "[t]he project shall have adequate traffic access, circulation and parking, and shall not cause unreasonable traffic congestion or unsafe conditions with respect to pedestrian or vehicular traffic or other transportation facilities." Regulations § 540.III.C.

The DRB detailed the traffic safety representations presented by Applicants' expert and the Town of Middlebury Police Chief. DRB Decision 7–8, ¶¶ 39–43. The DRB noted that "three of the four traffic safety experts testified that their analysis of the sight distances at the proposed intersection [of Route 116 and the proposed access road] determined the Project would exceed American Association of State Highway Transportation Officials (AASHTO) minimum [sight distance] recommendations." Id. at ¶41. While unclear from the DRB Decision, it appears that the fourth "expert" to testify on traffic safety was the Middlebury Police Chief, who did not contradict the three other experts assessments of traffic safety; he simply did not opine as to the project's sight distance conformance with the AASHTO standards.

Nevertheless, the DRB noted that "[n]otwithstanding this expert testimony, the DRB remain[ed] concerned with safe stopping sight distance." Id. at ¶ 43. The DRB accepted that, based on the uncontroverted expert testimony, the proposed project conformed to the AASHTO safe stopping sight distance standard. Id. at 41. But the DRB nonetheless expressed a "concern." Id. at ¶ 43. In expressing its concern, the DRB did not reference any specific evidence in the record, but rather a hypothetical involving a southbound gravel truck that could

---

[19] In the section of their briefs discussing Regulations § 540.III.F (conformance with the Town Plan), Applicants focus on paragraphs 39–43 of the DRB's decision. Instead of addressing conformance with the Town Plan, those paragraphs address traffic, which is governed by Regulations § 540.III.C.

be stopped, waiting to turn left onto the proposed access way, when another gravel truck was also traveling southbound on Route 116. The DRB further theorized, again with no reference to specific evidence the DRB received, that these two gravel trucks could be stopped on Route 116 for some undetermined period of time, especially when "sufficient northbound traffic volume existed on VT Route 116 to require a truck entering the project site to wait for a gap in vehicles." Id. at ¶ 42.

The DRB did not define this wait time further and did not explain how this hypothetical wait time led them to conclude that "there are still significant safety concerns that would need to be addressed were this project to proceed."[20] Id. at ¶ 43. Based upon their expressed, but undefined, safety concerns, the DRB concluded that the project as proposed did not conform to Regulations § 540.III.C, which requires that, as part of the conditional use review process, the DRB determine whether a project has "adequate traffic access, circulation and parking, and [whether it will] cause unreasonable traffic congestion or unsafe conditions with respect to pedestrian or vehicular traffic or other transportation facilities." Id.

We find two defects with this section of the DRB's analysis. First, the on-the-record review process, when adopted by a municipality, requires that in its written findings, an appropriate municipal panel "shall explicitly and concisely restate the underlying facts that support [its] decision. They shall be based exclusively on evidence of the record in the contested hearing." 24 V.S.A. § 1209(b). Here, the DRB appears to concede that its concerns about safe stopping distances on Route 116 were made in direct contradiction to the uncontroverted evidence the DRB received. The DRB does not reference evidence that suggested such a safety concern, and we find none in the record. It appears that the DRB expressed this safety concern, in spite of the testimony and other evidence received.

Secondly, we note that Regulations § 540.III.C provides guidance to the DRB on what it may rely upon when considering whether a project will "cause unreasonable traffic congestion or unsafe conditions." Id. The DRB Decision is lacking any specific reference to the six bulleted guidance points in Subsection III.C and, where the DRB did refer to the types of evidence Subsection III.C suggests, such as "input from the Police Chief" and "traffic engineering

---

[20] The DRB noted two ways of possibly addressing its safety concerns: by requiring that the highway shoulders be widened and that sight lines along the project frontage be maintained.

studies," the DRB announced a legal conclusion that directly contradicts what that evidence supported.

When reviewing an appropriate municipal panel's factual findings in an on-the-record appeal, we are directed to show deference to the panel, particularly where the panel's findings are supported by substantial evidence in the record. Stowe Highlands Resort, 2009 VT 76, ¶ 7. But where no evidence appears in the record in support of the panel's findings, those findings cannot withstand a challenge on appeal. Id. Since the DRB here appears to have made its findings without evidentiary support, and perhaps in actual contradiction of the evidence it did receive, we must **STRIKE** the factual findings and legal conclusions contained in the DRB Decision at ¶¶ 42–43.

Were this the only nonconformity with the Regulations that this project faced, we would remand this matter to the DRB, with the direction that it render findings and legal conclusions in conformance with the evidence received. To the extent that the DRB remained concerned about traffic safety and those concerns were the only impediment to the DRB approving the permit application, we would have encouraged the DRB to impose conditions that would alleviate its concerns, if the DRB determined that such conditions were feasible. But we do not direct remand and a further DRB review here, since we have upheld the DRB's other determinations of this project's nonconformity with the applicable Regulations.

### 5. Conformance with the Town Plan (Regulations § 540.III.F).

Applicants argue that the DRB erred by concluding that their proposed project does not comply with the "Town Plan Conformance" section of the Regulations, which states in its entirety, "The project shall comply with and actively further the Town Plan. The DRB shall consider the standards and action steps set forth in the Plan and the Land Use Section including the neighborhood plans."[21] Regulations § 540.III.F. We agree with Applicant on this point.

Although this type of regulatory provision is only occasionally seen in municipal regulations (and when it is, it most often only pertains to conditional use review criteria), the standard is well-developed in the context of criterion 10 of Act 250, which requires that a proposed development be "in conformance with any duly adopted local or regional plan."

---

[21] As noted above, in the section of their briefs dedicated to a discussion of compliance with the Town Plan under Section 540.III.F, Applicants primarily discuss compliance with the traffic safety standard of Section 540.III.C. However, they address compliance with the Town Plan under their discussion of the character of the neighborhood or area affected.

10 V.S.A. § 6086(a)(10).   We have previously employed the Act 250 framework where a municipal regulation required conformance with the Town Plan.  See In re Quesnel Waiver Appeal, No. 150-10-110 Vtec, slip op. at 6-7 (Vt. Super. Ct. Envtl. Div. July 2, 2012) (Walsh, J.) (requiring "conformance with the Town Plan"); In re Blakeman Site Plan, No. 274-11-06 Vtec, slip op. at 7 (Vt. Envtl. Ct. July 30, 2007) (Wright, J.) (requiring compliance with the "intent of the Town Plan").  As in Quesnel and Blakeman, the language of Regulations § 540.III.F closely tracks that of Act 250 criterion 10.  Accordingly, we turn to Act 250 jurisprudence for guidance in determining whether Applicants' proposed project complies with the Town Plan.[22]

In reviewing a project's compliance with a town plan, we must ensure that the provisions of the town plan set forth a "specific policy."  In re John A. Russell Corp., 2003 VT 93, ¶ 16; Quesnel, No. 150-10-110 Vtec, slip op. at 6–7.  This policy must be "stated in language that 'is clear and unqualified, and creates no ambiguity.'"  John A. Russell Corp., 2003 VT 93, ¶ 16 (quoting In re MBL Assocs., 166 Vt. 606, 607 (1997) (mem.)).  Broad, abstract policy statements "may not be given 'the legal force of zoning laws.'"  Id. at ¶¶ 16–17 (quoting In re Molgano, 163 Vt. 25, 31 (1994)).  Aspirational purpose provisions are unenforceable in the context of a specific permit application review process.  See In re Pion Sand & Gravel Pit, No. 245-12-09 Vtec, slip op. at 18 (Vt. Super. Ct. Envtl. Div. July 2, 2010) (Durkin, J.).

To ensure that a town plan sets forth a specific policy, the Court must first determine whether the plan's language is mandatory or merely aspirational.  Quesnel, No. 150-10-110 Vtec, slip op. at 7; Blakeman Site Plan, No. 274-11-06 Vtec, slip op. at 7 ("The language in the local plan must be mandatory, as opposed to merely providing 'guidance.'").  If the language is mandatory, the Court must then determine whether the provisions are specific enough to "evince a specific policy," at which point the proposed project will be reviewed for conformance with those specific town plan provisions.  Quesnel, No. 150-10-110 Vtec, slip op. at 7.  A town plan "evince[s] a specific policy if it '(a) pertains to the area or district in which the project is located; (b) is intended to guide or proscribe conduct or land use within [that area or district]; and (c) is sufficiently clear to guide the conduct of an average person, using common sense and understanding.'"  In re John J. Flynn Estate and Keystone Dev. Corp., #4C0790-2-EB, Findings

---

[22]  Moreover, because compliance with the Town Plan is a Section 540 conditional use requirement, Section 540.IV.A applies.  The criterion of Regulations § 540.III.F that a proposed project "comply with and actively further the Town Plan," is similar to Criterion 10 of Act 250, which requires that a development "be in conformance with" a local or regional plan.  Accordingly, pursuant to Section 540.IV.A, the "tests and procedures used in Act 250 case law" apply.

of Fact, Concl. of Law, and Order, at 27-28 (Vt. Envtl. Bd. May 4, 2004); see also Quesnel, No. 150-10-110 Vtec, slip op. at 8.

The DRB addressed the conditional use criterion of town plan performance in paragraph 46, which merely refers the reader to paragraphs 25 and 26 of the DRB Decision, both of which fall under the heading "The character of the Neighborhood or Area affected." In paragraph 25, the DRB recites the language of Section 8.6.L of the Town Plan, which provides:

> [The Butternut Ridge/Lindale] neighborhood has developed since the 1960's and consists of 4 subdivisions and PUDs, including the Lindale Mobile Home Park. South of Lindale is the well head protection area for Middlebury's water supply; zoning should be maintained as Forest/Conservation and [Agricultural/Rural Residential]. The PUD zoning for the Butternut Ridge/Lindale area could allow a small neighborhood store. Establishment of a small neighborhood store and recreational opportunities should be encouraged.

DRB Decision 5. The language of Section 8.6.L of the Town Plan suggests that it is a purpose provision related to the Butternut Ridge and Lindale neighborhoods. Nothing in the provision indicates that it is a specific policy requiring compliance. Instead of employing mandatory language such as the word "shall," the provision includes words such as "could," "should," and "encourage." Accordingly, we need not determine whether Applicants' proposed project complies with or actively furthers Town Plan Section 8.6.L, since that section is only aspirational in character and does not evince a specific policy. Lacking mandatory language, Section 8.6.L memorializes important aspirational goals, but it does not establish mandatory standards that can be used to regulate land uses.

Paragraph 26 of the DRB's decision does not quote the Town Plan itself, but instead quotes to a different section of the Regulations: conditional use criterion entitled "Character of the Neighborhood or Area Affected." The DRB quotes one portion of that section:

> A goal of the Town Plan is to allow for appropriate mixed uses to generally encourage balanced diversity, while protecting the essential character of neighborhoods. The existence of one conditional use in a neighborhood shall not be interpreted as justification for another similar conditional use to be located there.

DRB Decision 6 (quoting Regulations § 540.III.B.1). We regard the first sentence of this statement within the Regulations as a mere summary of the Town Plan. While perhaps helpful for contextualizing the Regulations' language regarding the character of the neighborhood or

24

area affected, it cannot stand in the place of the Town Plan[23] for the purpose of evaluating conformance with a town plan. As our case law suggests, evaluating conformance requires a careful examination of the plan itself and allows that only language that is regulatory in its character can be used in evaluating specific land use applications.

The DRB determined that Applicants' proposed project did not comply with the stated goals of Regulations § 540.III.B.1, and it denied the application in part on that basis. The DRB found "no evidence that another gravel pit, closer, will actively further these goals. On the contrary, the addition of another operation, as proposed will disrupt the balanced diversity of uses currently in place and will disturb the essential character of the existing neighborhoods." DRB Decision 6, ¶ 26. Because the DRB has not identified language within the Town Plan requiring compliance with such goals, the DRB erred by concluding that Applicants' proposed project does not comply with the Town Plan. We therefore **STRIKE** DRB Decision at 6, ¶ 26. However, our determination here does not change the outcome of this appeal, since additional DRB determinations remain that the project does not conform to applicable provisions from the Regulations.

### 6. <u>Access Limitations on Highways (Regulations § 630).</u>

Section 630 of the Regulations limits access ways established off of Route 116 and ten other state or town highways. The expressed purpose of this Section is "to maintain the through-traffic carrying function" of the enumerated highways. To effectuate this purpose, this Section limits the total number of access roadways permitted. Regulations § 630.I. To avoid additions of access roads when landowners subdivide their parcels, this Section defines the term "parcel" as "all contiguous lands within a person's boundary lines, or the lines of lands he controls, as those lines existed on March 23, 1973."[24] Regulations § 630.IV.

In light of this Subsection, the DRB determined that Applicants' parcel (known as Tax Map Parcel #6:70) and the adjoining parcel to the north (now known as Tax Map Parcel #6:70:010) were owned contiguously as of March 23, 1973 and contained a total road frontage of ±820 feet. DRB Decision at 9 ¶ 50. Using the table in Regulations § 630.I, which sets forth the

---

[23] Even if it could stand in the place of the Town Plan, we note that the sentence fails to set forth a specific policy and therefore does not require compliance. Section 540.III.B.1 expresses only a "goal," and lacks mandatory language.

[24] We understand March 23, 1973 to be the date on which these provisions of the Regulations became effective.

number of allowable access roadways based upon the amount of road frontage, the DRB concluded that because Parcel #6:70 has a single dwelling with two access roadways and Parcel #6:70:010 also has a dwelling with a single access roadway,[25] a new access roadway for the proposed gravel pit could not be allowed, "without the removal of both of the existing accesses to parcel #6:70." Decision a 9 ¶ 50.

Applicants contend that, instead of concluding that their application fails to conform to Regulations § 630.I, the DRB should have conditioned approval of the application on Applicants' limiting the number of access roads on the project parcel and that "such a condition would easily be met." Applicants' Brief at 22 (filed Feb. 15, 2012).

An appropriate municipal panel has the authority, when "rendering a decision in favor of the applicant, [to] attach additional reasonable conditions and safeguards as it deems necessary . . . ." 24 V.S.A. § 4464(b)(2). But that authority rests entirely with the municipal panel, as does the discretion to exercise it. Here, the DRB chose not to attach a condition limiting the number of access roadways. While not explicitly stated, we assume that the DRB chose not to go through that conditional exercise, since it had determined that the proposed gravel pit suffered from other, more substantial regulatory nonconformities that were prohibiting its approval. With this understanding in mind, we find no error in the DRB's analysis pursuant to Regulations § 630.I.

### 7. Test Wells (Regulations §§ 786 and 788.II).

The Town has determined that projects proposing the commercial removal of soil, sand or gravel must meet additional regulatory "definitions, standards, and conditions." Regulations § 786. Additional regulatory requirements are provided for quarrying activities by Regulations § 788. In particular, the proponents of a project governed by §§ 786 and 788 must present a "master plan" with their permit application, "to insure that upon completion of the excavation operations the site will be left in a safe and useful condition in conformance with the Town Plan." Regulations § 786.II.

The DRB concluded that Applicants' proposed project met some subsections of Regulations § § 786 and 788, but that it did not meet others. DRB Decision at 11–12, ¶ 70–78. In

---

[25] Applicants' Overall Site Plan, labeled SPI, depicts the two existing access roadways to the Fenn dwelling on Parcel #6:70, the dwelling and single access roadway on the parcel abutting to the north (Parcel #6:70:010) and the proposed access roadway to the proposed gravel pit, which is located along the southern portion of the Fenn property.

particular, the DRB concluded that Applicants' proposed project did not conform to Regulations § 788.II.A.2, which requires that an applicant include additional information on its site plan and with its permit application, including "a minimum of 4" test wells evidenced on the project plans, "to determine water tables." Id.

Applicants concede that they dug and provided reports on only three test wells and that those are the only test wells shown on their project plans. They contend, however, that instead of denying their permit on that basis, the DRB should have conditioned approval of the permit on completion of a fourth test well and the submission of the accompanying data.

When making a decision on a permit application, the DRB may choose to grant the permit, deny the permit, or grant the permit with conditions. See 24 V.S.A. § 4464(b)(2) ("In rendering a decision in favor of the applicant, the panel may attach additional reasonable conditions and safeguards as it deems necessary . . . .").[26] It was therefore within the DRB's discretion to deny the permit on the basis of Applicants' noncompliance with Section 788.II rather than grant it with conditions.

Moreover, there is substantial evidence in the record to support the DRB's finding that Applicants drilled only three test wells. As part of their amended application, Applicants submitted a Resource Evaluation and Hydrogeologic Analysis performed by Stephen Revell, Senior Hydrogeologist for Lincoln Applied Geology, Inc. The DRB received a copy of Mr. Revell's report, which was labeled as Applicants' Exhibit 11. Mr. Revell's evaluation mentions only three test wells, and an accompanying site plan map also indicates only three test wells. Id. Accordingly, the DRB did not err in basing its denial in part on Applicants' failure to comply with Section 788.II.[27]

---

[26] Applicants argue that the permit application should be denied only if there are no conditions which could have been imposed to remedy the perceived defect. In support of their argument, they refer to case and statutory law governing Act 250 applications which specifically pertains to Act 250 criteria 5 (traffic safety), 6 (provision of educational resources), and 7 (provision of municipal and governmental services). However, Section 788.II.A.2, which requires four test wells, does not address traffic, educational resources, or municipal and governmental services; its terms also only govern a municipal land use permit application, not one for a state land use application. Moreover, Section 540 governs conditional use review, and Section 786.II is not part of that review. Thus, the Act 250 standards are not applicable through Section 540.IV.A.

[27] Applicants also contend that because the application was deemed complete, the DRB waived its opportunity to impose a condition on the permit. However, a determination of completeness does not automatically presuppose that a zoning application is worthy of approval. See In re Appeal of Rivers Development, LLC, Nos. 7-1-05 and 68-3-07 Vtec, slip op. at 7, n.14 (Vt. Envtl. Ct. Jan. 8, 2008) (Durkin, J.) ("[A]n application may be deemed complete at the beginning of a municipal proceeding and may none-

27

**8. Aquifer and Wetland Protection Areas (Regulations § 680).**

Applicants contend that the DRB erred by concluding that the proposed project would violate Section 680 of the Regulations, which governs aquifer and wellhead protection areas. That section provides that "[a]ny use of land, change of use . . . or other land development which . . . could have an adverse effect upon the Town wells or aquifer, shall be prohibited." Regulations § 680.I.

The DRB found that the proposed project is located in the Aquifer/Wellhead Protection Area. It reviewed evidence from Applicants indicating that flow of groundwater would not impact the Town wells as well as evidence from Town officials indicating that the groundwater may affect the wells. However, based on the fact that Applicants did not dig a fourth test well, as discussed in Part III.7 above, the DRB ultimately concluded that Applicants did not meet their burden of showing that there would be no adverse impact on the aquifer/wellhead protection area. DRB Decision at 9–10, ¶ 53.

Applicants concede that they have not met their burden because a fourth well is required, but they contend that their failure to drill and test a fourth well was not a sufficient reason for the DRB to deny their application. Instead, they argue that the DRB should have issued a conditional permit. Applicants' argument here appears to infer that digging and conducting tests on a fourth well is merely a procedural exercise. We cannot agree, since Applicants' presentation before the DRB lacked the results from this fourth well.

As discussed above, when reviewing permit applications, the DRB may choose to grant a permit, deny a permit, or grant a permit with conditions. See 24 V.S.A. § 4464(b)(2). It was therefore within the DRB's discretion to deny Applicants' permit based in part on Applicants' noncompliance with Sections 680 and 788, rather than approving the permit with conditions.[28]

Moreover, there is substantial evidence in the record to support the DRB's conclusion that Applicants did not meet their burden of showing that there would be no adverse impact on the aquifer/wellhead protection area. Applicants submitted a study by Mr. Revell indicating that groundwater will flow from the project site to the northwest, and thus will not affect the Town wells to the south. (Exhibit 11, Site Plan Map EC1). However, the Town submitted an

---

the-less be deemed at the merits hearing to not have sufficient evidentiary support to be in conformance with the Zoning Regulations.").

[28] Again, Applicants contend that because the application was deemed complete, the DRB waived its opportunity to impose a condition on the permit. As discussed in above, this argument has no merit.

aquifer study performed by Phelps Engineering which indicates that groundwater may flow toward the Town wells. Thus, the DRB was presented with conflicting evidence regarding the direction of groundwater flow, but there was some evidence that Applicants' proposed project could have an adverse effect on a Town well or aquifer in violation of Section 680. Because drilling a fourth test well may have revealed more evidence regarding the potential adverse effect on Town wells or aquifers, the DRB did not err by concluding that Applicants did not meet their burden of showing compliance with Section 680.

### 9. **Buffers (Regulations § 786.VIII).**

Applicants next contend that the DRB erred by basing its denial on Section 786.VIII of the Regulations. That section requires that a "buffer shall be maintained around all property lines, with no removal of vegetation or other alterations in a minimum buffer which shall be no less than . . . 100 feet from all abutting property lines . . . ." Regulations § 786.VIII.iii. However, "if there is no existing dwelling or camp on an abutting property within 400 feet of the property line in question, the buffer from that line may be reduced to 50 feet." Id.

Applicants first contend that the construction of a proposed berm within 100 feet of the Lindale property line is not a part of the proposed project but instead facilitates the project from an aesthetics standpoint. This is a distinction without a difference. Section 786.VIII clearly states that no removal of vegetation or other alterations is permitted in the buffer zone. Thus, regardless of the purpose the berm is intended to serve, if its construction requires removal of vegetation or other alterations to the buffer zone within 100 feet of the property line, it will violate Section 786.VIII.

The DRB found that the proposed project violates Section 786.VIII because the project plans indicate construction of a berm within the 100 foot buffer abutting the Lindale residential property line. DRB Decision at 12, ¶ 77. We find Applicants challenge to the DRB's berm determinations as lacking a legal foundation. We therefore decline to disturb the DRB berm determinations.

Finally, Applicants also contend that the DRB erred by denying the application instead of conditioning approval of the application on correcting the intrusion into the buffer zone. As discussed above, however, when reviewing an application, the DRB may choose to grant a permit, deny a permit, or grant a permit with conditions. See 24 V.S.A. § 4464(b)(2). Accordingly, it was within the DRB's discretion to deny the application rather than grant it with

conditions. The DRB's reasoning appears sound, given the project's failure to conform to other regulatory provisions.

**10. Remaining Questions in Applicants' Statement of Questions.**

As part of their appeal, Applicants submitted a Statement of Questions containing 24 Questions. Several of the Questions were not briefed, however, and thus they are waived. See McAdams v. Town of Barnard, 2007 VT 61, ¶ 8, 182 Vt. 259 ("Arguments not briefed are waived."); In re J.A., 166 Vt. 625, 626 (1997) (mem.) ("Issues not briefed are waived."). We therefore decline to address Questions 2, 3, 4, 5, 21, and 23. We have fully addressed the remaining Questions in our decision above.

## Conclusion

For the reasons detailed above, we:

1. conclude that the DRB Decision and the procedures it followed do not contain the procedural flaws that Applicants asserted.

2. **AFFIRM** the DRB's findings with respect to

   a. Regulations § 540.III.B.1 (character of the neighborhood/area affected);

   b. Regulations § 540.III.B.2 (aesthetics);

   c. Regulations § 630 (highway access limitation standards);

   d. Regulations § 680 (aquifer/wellhead protection areas);

   e. Regulations § 750.I (noise performance standards);

   f. Regulations § 786.VIII (setback encroachment by berms); and

   g. Regulations § 788.II (test wells).

3. **STRIKE** the DRB's findings and legal conclusions with respect to traffic safety (Regulations § 540.III) for lack of evidentiary support and **STRIKE** the DRB's findings with respect to conformance with regulatory provisions of the Town Plan, since the DRB's only findings and conclusions relate to provisions that are aspirational and therefore non-regulatory in nature.

4. Despite STRIKING the findings and legal conclusions referenced in the immediately preceding paragraph (paragraph 3), we **AFFIRM** the DRB denial of Applicants' application, since we have also affirmed the DRB's determinations itemized in paragraph 1(a) through (g), above.

5. Finally, we do not address and therefore do not disturb any provisions of the DRB Decision that were challenged by Applicants in any remaining Questions from Applicants' Statement of Questions (filed October 19, 2010) because we have concluded that Applicants did not adequately brief those Questions.

Done at Newfane, Vermont this 13th day of November, 2012.

_____

Thomas S. Durkin, Environmental Judge